**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 12-CV-23927-PAS**

| | | |
|---|---|---|
| SALUD SERVICES, INC., et al., | ) | Miami, Florida |
| | ) | |
| Plaintiff, | ) | October 9, 2013 |
| v. | ) | |
| | ) | |
| CATERPILLAR, INC., | ) | |
| | ) | |
| Defendant. | ) | Pages 1 - 65 |
| _____ | ) | |

DISCOVERY HEARING

BEFORE THE HONORABLE ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:                    LEOPOLD LAW, P.A.
                                      2925 PGA Boulevard,
                                      Suite 200,
                                      Palm Beach Gardens, FL 33410
                                      BY:  THEODORE J. LEOPOLD, ESQ.


                                      FARMER, JAFFE, WEISSING,
                                      EDWARDS, FISTOS & LEHRMAN, P.L.
                                      425 North Andrews Avenue
                                      Suite 2,
                                      Fort Lauderdale, FL  33301
                                      BY:  SETH M. LEHRMAN, ESQ.

(APPEARANCES CONTINUED:)


FOR THE DEFENDANT:                    ABADIN COOK, P.A.
                                      9155 South Dadeland Boulevard
                                      Suite 1208,
                                      Miami, Florida 33156
                                      BY:  KIMBERLY A. COOK, ESQ.



                                      SEDGWICK LLP
                                      2400 East Commercial Boulevard
                                      Suite 1100
                                      Fort Lauderdale, FL 33308
                                      BY:  DAVID J. DE PIANO, ESQ.



TRANSCRIBED BY:                       BONNIE JOY LEWIS, R.P.R.
                                      7001 Southwest 13 Street
                                      Pembroke Pines, Florida 33023
                                      (954) 985-8875
                                      caselawrptg@gmail.com

1          (Thereupon, the following proceeding was held:)

2          THE COURT:  This is Case Number 12-23927; Judge Seitz.

3  Salud Services, Inc., et al, versus Caterpillar, Inc.

4          Counsel, would you please note your appearances for the

5  record.

6          MR. LEOPOLD:  Ted Leopold on behalf of the plaintiff, Your

7  Honor.  Good morning.

8          THE COURT:  Good morning.

9          MR. Good morning, Your Honor.  Seth Lehrman, counsel --

10         THE COURT:  I'm sorry.

11         MR. LEHRMAN:  Seth Lehrman counsel for plaintiffs.

12         THE COURT:  Okay.

13         MS. COOK:  Good morning, Your Honor.

14         Kimberly Cook.

15         MR. DE PIANO:  And David De Piano.

16         MS. COOK:  On behalf of Caterpillar.

17         THE COURT:  Okay.  Thank you.

18         Okay.  We're here today for a discovery hearing.  I have

19  the notice that was filed as well as a cross notice and I understand

20  that with respect to the cross notice, there are matters that are

21  either going to be deferred or put on the record.  It's not clear to

22  me.  It doesn't make sense to start with the cross notice.

23         MR. LEOPOLD:  Ted Leopold, Your Honor.

24         I believe that it does.  I'm not sure we have total

25  agreement on the issues.  I was just told this morning that despite

1  good efforts, in terms of communication and working in good faith to

2  try and get the production, which we don't believe has been timely,

3  that today we are being provided a disk that contains approximately

4  20- to 25,000 documents.

5          That being said, there still is an issue about what those

6  documents contain if it is responsive to the requests that we have

7  been searching for and actively attempting to try and work out with

8  the defendants and I don't know the answer to that.

9          THE COURT:  Okay.  Let me hear from you, Miss Cook.

10         MS. COOK:  Yes, Judge.

11         As Mr. Leopold said, we have I think it's 28,000 documents

12 that are being produced later today.  We had agreed and worked out

13 an agreement where the documents are being produced in a rolling

14 fashion because of the extent of the request.  There were 70

15 requests, very, very expansive.  It's a huge undertaking.  And we

16 have would have hoped that the second wave would have been produced

17 sooner.

18         In fact, the last time we spoke to plaintiff's counsel, we

19 were hoping it would be last week, but we're working through an

20 E-discovery liaison, a gentleman by the name of Patrick Chavez

21 because of a lot of the documents are stored electronically.

22         It has just created scheduling issues and some logistical

23 issues that have taken longer than we thought, but as we have

24 forensic and communicated with plaintiffs all along, our intent is

25 that production will be completed by the end of the month.  We are

1  working hard to make that happen.  I think this is premature because

2  we have not yet finished our production, but I do believe that the

3  plaintiff has at least expressed a concern about it in their notice

4  has to do with documents produced -- maintained by Caterpillar that

5  reflects analysis or investigation regarding these engines based

6  upon the repairs or adjustments that were made by the dealers.

7        And a number of the documents are going to contain that

8  type of information.  So to the extent that was the plaintiff's

9  concern, I think that's going to be addressed largely by a lot of

10 the documents that are being produced.

11       THE COURT:  Okay.  Well, does it make sense to set a

12 deadline for the completion of production and then, if after having

13 an opportunity to review the documents, there's a deficiency to come

14 back.

15       Is that the plaintiff's position?

16       MR. LEOPOLD:  Your Honor, I appreciate your comments and

17 that was one of the things that I was going to address to the Court.

18       We've had this discovery out since June.  We need a -- for

19 lack of a better word -- a drop dead deadline to get this production

20 completed.  The fact -- and I appreciate the efforts on behalf of

21 defendant working with the liaison, that's their issue.  We have a

22 court discovery schedule that we need to adhere to.  And we would

23 ask the Court to enter a drop dead deadline where all production

24 needs to be completed no later than the end of this month.  That's

25 number one.

1          Number two, is I still -- and specifically in regards to

2    the question by the Court to defense counsel -- is the production of

3    the 25 some odd thousand documents responsive to our cross notice

4    today.  And I, respectfully, never really heard a response to that.

5    We need to know since we have been actively attempting to obtain

6    these documents that are very directed towards the discovery and

7    that Judge Seitz, in her order, which she's having a hearing on next

8    week specifically wants answers to is contained within that

9    discovery.

10          And I've not been able to get an answer to that and we need

11   to know that because we have a hearing, based upon Judge Seitz'

12   order, next week.  And we are going to have to answer many

13   questions, which I have a copy of Judge Seitz' order if the Court

14   wishes to see that, where she is going to ask specific questions

15   that we need this discovery for.  And I don't know if that

16   production that they're handing us today is responsive, which we

17   have requested.

18          THE COURT:  One of my handicaps in preparing -- well, I

19   have two handicaps -- one, was that the plaintiff didn't provide any

20   background, any source material.

21          So I have no clue what the response was, whether the

22   response we will produce these documents or whether the response is

23   limited to the documents.  So I don't know what the issue is between

24   the parties.  And so I don't know if there's a disagreement over the

25   scope of what's being produced or not.

1       MR. LEOPOLD:  I don't believe that there is and in our

2  papers --

3       THE COURT:  Okay.

4       MR. LEOPOLD:  And I realize that we did not supplement it

5  with accompany documents, but we attempted to lay out in a shorthand

6  fashion, if you will, what the issues were and what the requests

7  were that the defendants are supposed to be going back and obtaining

8  the backup analysis and information for related to the system

9  defect, which is what the warranty work has been for.

10      And that has been what we have worked very hard to obtain

11 and that is which Judge Seitz indicated in her order of September

12 30th, for which we have a hearing next week, wants answers to and we

13 need to know whether that discovery is in this disk that is being

14 provided to us today.

15      THE COURT:  Okay.  Let me hear from the defendant.

16      So the issue is the date of production and when you can

17 complete the production.  So why don't you tell me when you can

18 complete the production that will have all of this information in

19 it.

20      MS. COOK:  Judge, based upon our original agreement, we

21 have advised the plaintiff from the beginning that our goal was to

22 have the production completed by October 31st and that's still our

23 intent.

24      THE COURT:  Okay.  Well, now, I mean -- and I understand

25 there's an original agreement and whatever there was between the

1  parties, but what I want to know is, you know, you're well along the

2  way.  And I understand that a prediction in July that you'll be

3  finished by the end of October may be one thing.  And then, October

4  -- whatever today is is the 9th, yeah, the 9th -- you know, you should

5  have by now a pretty good idea if that October 31st date is not

6  going to be met or otherwise I'll just order that the production be

7  completed by October 31st.

8          If for some reason you are unable to answer the questions

9  posted by Judge Seitz -- and I would assume that the plaintiffs as

10  well as the defendants would be getting together because I think she

11  envisioned there might be areas where you would stipulate to those

12  questions.  And I have read her order and I'm familiar with the

13  facts she's got on her hearing that was continued, I think, at the

14  request of the parties, if I'm not mistaken.

15          MR. LEOPOLD:  That is correct, Your Honor.

16          MS. COOK:  So Judge, the date is --

17          THE COURT:  Okay.

18          MS. COOK:  -- we think we can finish by October 31st.

19          THE COURT:  Okay.

20          MS. COOK:  And what we're doing is, as we're able to

21  complete sets of categories of things we're producing them.  So for

22  example, you know, there may be a request that is partially

23  responded to because we were able to get what we needed and it may

24  already be responded.  I can't, now, go through the list and say

25  exactly which ones of the 28,000 --

1          THE COURT:  Okay.  Let me ask you this.

2          I assume you've read Judge Seitz' order --

3      MS. COOK:  Yes.

4          THE COURT:  -- that was entered some time ago.

5      MS. COOK:  Yes.

6          THE COURT:  And so I assume you're familiar with the

7  information that she wants the parties to be able to address.

8          MS. COOK:  Yes.

9          THE COURT:  And are you prepared to address all of the

10  areas?

11          MS. COOK:  We are.  We are prepared to address all of the

12  areas.  There are certain of the questions, the way the judge

13  phrased some of the issues, Caterpillar doesn't necessarily maintain

14  -- for example, Judge Seitz has asked for information concerning the

15  number of times buses, quote, de-rated or shut down.

16          Caterpillar does not maintain its documents based on those

17  words.  It maintains its records based on a particular part of an

18  engine that is causing problems.  Some of those problems might have

19  led to de-rating or shutting down.

20          So it's part of what we're going to be doing is explaining

21  how those documents are kept, we've done searches based on only

22  those particular words.  We've come up with a number that responds

23  to those particular words.  Some of it -- again, some of it is

24  related to how the data is maintained within Caterpillar.

25          THE COURT:  Okay.  And are you providing or have you

1  provided the documents to the plaintiffs so that the plaintiffs can

2  do their own analysis of those documents and come to their own

3  conclusions about --

4          MS. COOK:  Based on Judge Seitz 's questions?

5          THE COURT:  Right.

6          MS. COOK:  There's no document that responds specifically.

7          THE COURT:  No, I'm saying in the universe of documents.

8  You said you've done and a search and you've come up with numbers

9  and you're going to explain it, but obviously the plaintiffs also

10  need to have the ability to discuss this with Judge Seitz.

11          And what I hear plaintiff saying they want to know, are the

12  documents you're producing today combined with the documents you've

13  previously produced, are they sufficient documents so they will be

14  able to intelligently answer Judge Seitz' questions?

15          MS. COOK:  Judge, in all honesty, because these 28,000

16  documents are being produced today, I can't tell you whether those

17  documents contain everything they need to respond to Judge Seitz'

18  questions.

19          I just can't because it's happening as we're speaking in

20  terms of this production.  Some of the questions that the plaintiffs

21  asked, or some of the documents that the plaintiffs asked us to

22  produce, I think, will include some of Judge Seitz' questions.  So

23  we will --

24          THE COURT:  Okay.  What's left to produce, you know, in

25  terms of what haven't you produced that they've asked for?

1          You say you're doing production on a rolling basis and you

2  expect the production to be done within the next, I would say one,

3  two, three and-a-half weeks; less than three and-a-half weeks.

4          MS. COOK:  Judge, my understanding of where we are in the

5  sequence is that the last category, or group of documents, relate to

6  a search of a -- I want to will call it a master universe.  I'm not

7  sure if that's the correct technical term, but it's a large number

8  of electronically stored documents that Caterpillar created several

9  years ago where there was other similar litigation.

10         These documents would, otherwise, have been probably not

11  maintained in accordance with Caterpillar's document retention

12  policy, but Caterpillar created this database in anticipation of

13  perhaps there being other litigation.  And so that is a -- I can't

14  even tell you how large that universe is.

15         THE COURT:  And where was that litigation?

16         MS. COOK:  I don't know exactly where that litigation was,

17  Your Honor.

18         MR. LEOPOLD:  It was in Texas, Your Honor.

19         THE COURT:  Okay.

20         MS. COOK:  But the last phase of the production involves

21  coming up with search terms that we believe are going to capture the

22  maximum number of documents that would be responsive to plaintiff's

23  request and working with our E-discovery liaison to go through and

24  capture those documents, then review those documents, and produce

25  those documents.

1          And that's -- I just -- Mr. De Piano is very involved in

2   that and I just wanted to find out if he had any other information

3   than what I've already expressed.

4          MR. DE PIANO:  No, Judge.  That's the process we've been

5   going in and it's been a three-stage process to try to comply in a

6   timely manner.

7          And the first effort, in part, in response to the

8   plaintiff's request, we provided plaintiff specific documents they

9   wanted to prepare plaintiffs for deposition and they wanted

10  documents that related to their guys.

11         Also, documents that were referenced documents, the low

12  hanging fruits, if you will, they wanted to get to that as quickly

13  as possible.  The second part of the production that's going out

14  today is more of a categorical search.

15         They've asked specific requests and it took a bit of an

16  investigation to find categories of responsive documents, including

17  the analytical documents that they've been recently clamoring about

18  and that's going to go out today.  And it will be partly responsive

19  to a number of requests mentioned in the memorandum.  Specifically,

20  those that talk about analytics.

21         I can't say they're completely responsive because the third

22  waive is this ESI search that Ms. Cook was just describing where

23  they're going to go into the preserved documents using search terms

24  to find the set of responsive documents, potentially responsive

25  documents, refine them and complete production, at least the

1  majority of the production, by the 31st.  If there are a few

2  stragglers, there may be followup if needed, but they're going to

3  have everything in a general fuzzy way by the 31st.  And certainly

4  shortly thereafter, anything that we've identified as needing

5  followup.

6          THE COURT:  Okay.  I'm not sure what general fuzzy way

7  means.

8          MR. DE PIANO:  Neither am I, Judge.

9          It has been a long process and we've found more problems as

10  we've found more responsive documents.  And the 31st will certainly

11  be the end day of our first official response, but like plaintiffs

12  who have been having a rolling production of things they've found

13  after their first response, there's a chance that we'll find the

14  documents that either need additional followup because they lead to

15  other documents, or documents that need further review because

16  they're exceptionally large.  And those few stragglers may be beyond

17  the 31st, but it will certainly be an ongoing effort that we'll

18  included with plaintiffs --

19          THE COURT:  Okay.

20          MR. LEOPOLD:  May I respond a little bit, Your Honor?

21          THE COURT:  Okay.  Just tell me what you want to me do at

22  this point?

23          MR. LEOPOLD:  Several things, Your Honor.

24          One, we need a court order saying -- as all clients do on

25  both sides -- a drop dead date when the discovery, per Court order

1   must be due and they may have to double-time it a little bit to get

2   it done, but this has been going on for much too long now.  We've

3   asked for October 31st to be that drop dead cutoff time.  That's

4   number one.

5            Number two, Your Honor, it gives me a little bit of pause.

6   I just heard a moment ago, and as the Court was advised a few

7   moments ago, there was another litigation dealing with almost

8   identical substantially similar issues that was in Texas.  There was

9   a group of documents that Caterpillar has now stored and retained as

10  a result of that litigation.

11           If I misunderstood, I'm sure counsel can correct me, but I

12  just heard now you that they are now just going to that group to do

13  searches for documents to produce in this case.

14           I find that somewhat hard to understand that those

15  documents, which go to the core of the issues in this litigation,

16  which have already been litigated to which Caterpillar has already

17  circled the wagons around and has retained, has not done that search

18  earlier to produce those documents much earlier on.

19           In addition, we met with the defendants back in April and

20  attempted -- knowing and being informed that they had retained these

21  earlier litigated documents -- to provide search terms.  They

22  refused to agree to the search terms.  They wanted to do their own

23  searches based upon their own search terms.  They will not advise us

24  what those search terms are, which I think we are entitled to know,

25  which I would ask the Court to be ordered to provide us those search

1  terms.

2          And in addition, we have requested that whoever is doing

3  those searches, we have the names of those individuals so that we

4  can take a 30(b)6 type of deposition of those individuals.

5          We think -- and I still am not aware whether we're going to

6  be able to answer -- hopefully we can -- Judge Seitz' questions

7  based upon her order as a core of the group of documents that are

8  being produced, but it's, I think, important for the Court to

9  understand this is data that is already generated in Caterpillar's

10  system.  All of this information is downloaded on every vehicle they

11  work on regarding the axillary regeneration device.  It's not

12  something they have to go and create.  It's already there.

13          And for all those reasons we ask that the Court order, not

14  only a drop dead time, an understanding of the search terms they're

15  using, that all those documents be produced forthwith no later than

16  August 31st and --

17          THE COURT:  You mean October 31st.  You said August.

18          MR. LEOPOLD:  I'm sorry, Your Honor.

19          THE COURT:  We're either a little late or very early.

20          MR. LEOPOLD:  October 31st.  Well, they're a little late,

21  but I'll say October 31st of 2013.

22          And also, that we be provided, again, not only the search

23  terms that they are using, but also the individual or individuals

24  that are searching for those documents as well.

25          THE COURT:  Okay.  Miss Cook.

1          MS. COOK:  Sure.  A couple of things, Judge.

2          Number one, the plaintiff's specific data is what was

3  requested in our ongoing discussions with the plaintiffs.  That's

4  what they have.  We gave them that.  Those are what are called the

5  ECM downloads, which is the electronic data stored for each specific

6  bus.  So they have that and that's what they wanted first and that's

7  what we gave them.

8          This universe of documents is way broader than this

9  lawsuit.  And so it's not as if there is a defined set of documents

10  sitting there waiting to be requested.

11          THE COURT:  I understand.  I understand that and he was not

12  suggesting that you do a whole cell turnover of every document

13  preserved in the other litigation.

14          What he was saying is, this is a universe of documents that

15  needs to be searched.  It's there and it's electronically stored we

16  want to meet and talk about search terms.  You didn't want to meet

17  and talk about search terms.  You wanted to do your own search

18  terms, which is fine.

19          But I will tell you, in my experience, a meet and confer

20  over search terms is usually a good thing because when that does not

21  happen, what the results sometimes is, is I then have a discovery

22  hearing and I say, well, I think you need to go back and search

23  again using these other search terms.

24          So you need to tell him and you to need to be prepared to

25  tell him the methodology by which this search was conducted in terms

1   of the person's names, the identity of the people.  I suppose if he

2   hasn't propounded an interrogatory which asks the identity of the

3   persons involved in, you know, responding to the request for

4   production, I assume he will, or you can provide it, or I will order

5   it.

6         So you can, you know, they can either take a 30(b)6

7   deposition, at which point, you would designate the person that

8   would respond to how the search was conducted, or they can identify

9   a particular person they want to depose, which would be just like

10  any other witness.  But so, I'm not sure, you know, that that was

11  particularly noticed or that you have forensic that.

12         MS. COOK:  Judge, this issue about, you know, the ESI meet

13  and confer, and the protocol that came out of that, was in April.

14  And there has not been any objection, discussion, issue raised since

15  then until now.

16         In fact, it wasn't even raised until, you know, I'm hearing

17  Mr. Leopold say it for the first time.

18         THE COURT:  Okay.

19         MS. COOK:  And I was not at that meet and confer.  Mr.

20  Piano is and I think he just wants to fill in some of the blanks.

21         THE COURT:  I'm not going to deal with it now.

22         What I am going to tell you is, this is my -- basically, my

23  order is the production needs to be completed by October 31st.  So

24  whatever it is you need to do to complete your production by October

25  31st, you need to complete your production by October 31st.

1        Obviously, if there's something that you're not aware of

2   that you want to come across, there's always a duty to supplement,

3   which you need to have completed your first, your response by

4   October 31st.

5        MS. COOK:  We understand.

6        THE COURT:  And it doesn't mean, well, I couldn't review

7   this document that we uncovered that we know we need to produce, but

8   we need to review it more.  I want all of that done by October 31st.

9        Obviously, if during the course of looking at your

10  documents, you come up with something that should have been produced

11  and it wasn't, you can supplement.

12       The second thing is, I will just tell you with respect to

13  the search methodology, you can either discuss it among yourselves

14  and see if you can reach an agreement, see if you can talk about how

15  it was done, what search terms were used.

16       They can propound an interrogatory, which I would let them

17  propound and I would give you about five days to respond to it in

18  writing on an expedited basis if they chose to go that way, or they

19  could take a 30(b)6 deposition and not use an interrogatory and just

20  ask how it was done, but I can tell you that I think it's routine to

21  allow an exploration into how a search was conducted of particular

22  documents.

23       MS. COOK:  We understand.

24       THE COURT:  Yeah, but I'm not going to, like I say, I'm not

25  entering an order requiring any particular steps to be taken at this

1  time.  I'm just giving you my thoughts at an informal discovery

2  conference to hopefully assist you all in working out the best way

3  to pursue this, you know, without the need for an order.

4          So the only order that I'm entering is going to say

5  production has to be completed by October 31st and, you know, the

6  parties are to confer regarding any issues related to search

7  methodology and set it for discovery hearing if necessary.

8          And I'll leave it up to you.  I mean, you all are

9  professional and you seem to work well together and I think you

10  ought to be able to resolve that.  And we probably could have

11  resolved this in about five minutes instead of 25, but in any event,

12  I think that should take care of it.  The plaintiffs will get what

13  they get.  If there is some reason that you can't answer Judge

14  Seitz' questions, you can explain to her why that is and take it

15  from there.

16          So let's move, now, to the first notice of hearing, which I

17  normally would have done.  I just thought the plaintiff's notice

18  from what, you know, from what I had been advised of was going to be

19  resolved pretty quickly.  And I think there is, in general,

20  agreement with respect to the plaintiff's notice.

21          Now, we get to the defendant's notice of hearing.  Now, I

22  will tell you hat I have looked at the notice of hearing.  I have

23  scanned the voluminous documents.  The main reason we want source

24  materials is sometimes it's useful in terms of learning where the

25  dispute lies.  Sometimes I just use it to look at during the course

1  of a hearing when you're referring me to particular items and I'm

2  just not entirely sure where we're at in terms of some of the

3  disputes.

4         Now, I know there was a comment that the plaintiffs are no

5  longer seeking lost profits, but I don't know what damages you are

6  seeking.  I don't know what you're considering to be lost profit

7  damages and without knowing a damages calculation, it's difficult

8  for me to know what documents need to be provided.

9         I know, in the last order, I directed the parties to meet

10  and confer to try to determine what documents were necessary in

11  order to, you know, permit the defendants to challenge any damages

12  claimed by the defendants.

13         And I assume that it was in that context that the

14  plaintiffs said that they were not going to seek lost profits.  But

15  of course, that's not part of the official court record in this

16  case.

17         So let me hear briefly from you, I guess, Miss Cook.

18  You're going to be the one addressing it.  You can take your issues

19  in any order that you want recognizing that there's limited time

20  here.

21         MS. COOK:  Sure.  Judge, thank you very much.

22         And since you brought up the lost profits issue, we will

23  start with that and it really involves four different responses.

24  It's Interrogatory Number 21.

25         THE COURT:  Right.

 1        MS. COOK:  And request to produce 49 and 10 that relates to

 2   all plaintiffs, except for Salud.  And the Salud discovery related

 3   to this loss of profits issue would be Interrogatory Number 12,

 4   request to produce 14, 9, and 10.

 5        THE COURT:  And I started because those are the first two

 6   issues that you listed.

 7        MS. COOK:  Yes.  And it all relates to, as you've stated,

 8   Judge, the plaintiffs at our meet and confer that you ordered told

 9   us that they were no longer seeking lost profits.  And therefore, as

10   you saw in their responses, they arbitrarily decided that they were

11   not going to produce anything related to either financial data,

12   including documents that would allow us to figure out how they

13   operate their business.

14        And they, also, arbitrarily decided that they were not

15   going to produce information about other buses in their fleets, that

16   other buses that did not have the subject engines.  And we would ask

17   that the Court order that, notwithstanding the plaintiff's position

18   that they're no longer seeking lost profits, we believe that that's

19   information that's still discoverable.

20        The official record, as you stated, still includes a claim.

21   The term lost profits is really nowhere in their complaint.  What

22   the plaintiffs are seeking is loss of revenue and other damages.

23        In paragraph --

24        THE COURT:  Why don't I see what it is that they're seeking

25   as damages and then we can see what information you need.

 1          For example, if the only thing they're seeking is the cost

 2  of repairs, then you don't need to know how their business operates

 3  because all they're looking to recover are their out-of-pocket costs

 4  to repairs.

 5          MS. COOK:  I don't believe that's the case.

 6          THE COURT:  Well, I don't know if it's the case or not.

 7  I'm just saying that when I looked at this, I felt that my time

 8  would not be well spent in pouring through detailed answers and

 9  contentions because I don't know what the parties' contentions

10  exactly are.

11          And so I want -- and it will be made a part of my order so

12  you will have a clear record with a Court order in terms of what the

13  defendants are limiting -- excuse me -- what the plaintiffs are

14  limiting themselves to so that the defendants will know what they

15  have to defend against.

16          So you can explain to me, Mr. Leopold.

17          MR. LEOPOLD:  Thank you, Your Honor.

18          Your Honor, the plaintiffs are essentially seeking two

19  types of damages.  One is -- for lack of a better phrase -- and the

20  Court may be familiar it has been bantered about in the variety of

21  litigation diminution of value for re-energizing the engines or

22  replacement of the engines for these particular buses.  Both of

23  those are not categories of, quote, lost profits or something that

24  would be in the confines of the plaintiffs.

25          THE COURT:  Okay.  How do you figure?  How do you intend to

1 | figure this out?  What is the computation that you are using to
2 | figure this out?

3 | MR. LEOPOLD:  That will be by, clearly, expert testimony,
4 | number one.  And number two, that will be testimony within
5 | Caterpillar's own domain that through the course of discovery we
6 | will be able to obtain as well.

7 | Clearly, the replacement value of engines, since they did
8 | the warranty work, the cost of those repairs going into the future,
9 | as well as in the past, will be elements of damages that we can
10 | obtain through the discovery, which we intend to do.

11 | THE COURT:  And I guess where I don't know -- when you say
12 | diminution of value -- I don't know what elements you contend go
13 | into the diminution of value.

14 | Are you intending that to include things like, had this bus
15 | been working it would have been chartered out to ex-number of
16 | passengers?  I mean, because it could arguably encompass lost
17 | profits.

18 | MR. LEOPOLD:  And that's a very good and appropriate
19 | question from the Court.

20 | I would say, generally, a diminution of value is not an
21 | element of damage.  The diminution of value generally is you buy X
22 | for, say, a $100, but because of the inherent defect, which we know
23 | existed in Caterpillar by Caterpillar's own warranty fixes, if you
24 | will, the actual value of the bus that they purchased was only
25 | valued at $70.  And so the diminution of value is that change, that

1  $30.

2          THE COURT:  Okay.  And how do you figure that out?  What

3  are the elements that you use to figure out what the diminution of

4  value?

5          I guess, it's sort of a circular way which gets back to why

6  I was saying does it involve a calculation of what that engine would

7  be used for.

8          MR. LEOPOLD:  It does involve a calculation, but it is not

9  the type of calculation that one would have as a private business

10  owner that owns a couple of buses and leases out and transports

11  passengers, tourists, whatever it be may be.  That's not the type of

12  information that they would have.

13          The type of analysis is expert analysis, market analysis,

14  industry analysis, manufacturing analysis, and warranty repair

15  analysis, all of which is in the domain of not only experts, but

16  also clearly within the domain of Caterpillar.

17          THE COURT:  So you're saying that the diminution of value

18  will not involve any earnings that would have been derived from the

19  use of this?

20          MR. LEOPOLD:  That is correct.

21          The diminution of value is the diminution of value of the

22  product that was purchased.  Again, you purchase it for X, but

23  really because of the defect has a value of Y.  What is the

24  difference in that value?

25          In addition, Your Honor, there is one component that is an

1  element of damages.  And this is where, perhaps, we need to massage

2  the issue and look closer if we haven't provided, we need to go back

3  because of the regeneration defect problems where the bus is

4  constantly breaking down.

5        There are out-of-pocket expenses, not profits, but expenses

6  that the different plaintiffs have had to come out and pay for the

7  passengers transporting them to their locations.  That is

8  out-of-pocket expenses that they have had.  There may be lodging

9  issues.  There may be rental of more buses to take care of the

10 transportation problems as a result of their buses being down.

11       So those types of documents may have to be searched for.

12 If they have not been produced that is an element of documentation

13 that we will need to obtain and produce.

14       THE COURT:  Okay.  And what about things like refunds to

15 passengers of transportation costs?  Is that part of it?

16       MR. LEOPOLD:  That may very well be a part of it.  I think

17 we will have to --

18       THE COURT:  Because if it's refunds to passengers, then

19 obviously not the -- the total amount of the refund does not

20 necessarily equal the out-of-pocket expense of the plaintiff since

21 if a passenger, a bus passenger pays -- and I'm just saying this

22 aloud so that you can tell me if I've understood it or misunderstood

23 it.

24       A passenger buys a bus ticket to go from Miami to Orlando

25 and pays $100.  What a deal.  And the bus breaks down and the

1  passenger demands and so you can't transport this person at all.

2  And the passenger demands a refund and you give the passenger back

3  the $100.  Well, it would have cost you $50 to transport that

4  passenger.  And so, then, you have the whole idea of, well, what

5  does that $50 consist of?  What are you attributing to your cost

6  versus your profit?

7         So even not the refund could be characterized as an

8  out-of-pocket expense.  It has a component part of it that seems, to

9  me -- and I am not an accountant.  I'm not an expert in accounting,

10 but just thinking about it.

11        MR. LEOPOLD:  I think on this other component of damages, I

12 think we need to drill down on that issue further.

13        And if the documentation -- and I don't know from my

14 perspective if that has been produced, but since that is an element

15 of damages and I don't think that's a, quote, lost profits aspect,

16 but I do think it's an out-of-pocket damage, which is different.

17 Although it may go to a profit issue, but it's more re cost issue.

18 We need to drill down and obtain that information.

19        And if we have leave of Court of some time to do that, then

20 I think we need to come forward with an appropriate response, either

21 via an interrogatory and/or production of documents to establish

22 this is the out-of-pocket, if you will, expenses.

23        THE COURT:  I think what needs to happen, is you need to

24 tell the defendant exactly what your computation is of the damages

25 that you're seeking in order, if you believe the discovery should be

1   more limited because you're not seeking a lost profit that results

2   from the bus being out of service.  I gather that's the aspect that

3   you're abandoning; is that correct?

4        MR. LEOPOLD:  That's correct, Your Honor.

5        And we can do that with some limited time.  I think we can

6   formulate an appropriate response that hopefully will make the

7   defendants comfortable -- or the defendant comfortable -- and if

8   not, I'm sure we can address it.

9        THE COURT:  Okay.  Let me hear from -- and I will say this,

10  that it does seem to me that once I've had a hearing and entered an

11  order that's really not the time to, then, decide oh, well, she

12  ruled against us so we better backtrack.

13       I mean, we had this lengthy hearing.  However, if you are

14  seeking to withdraw, you know, as part of your damages because of

15  the burden associated or the privacy concerns associated with the

16  production of sensitive financial information, you know, normally

17  what you would probably do is file something with the Court that

18  indicates that both because your opponent wants to be satisfied on

19  the record that it's clearly your doing.  And also, I think the

20  defendant needs to be able to explore what discovery is nevertheless

21  required.

22       So let know hear from you.  I know you've stood.  So Miss

23  Cook, that probably means like you really, really want to be heard

24  and you're afraid that if you don't stand, I might forget about

25  asking for your opinion.  I'm not sure of your position but --

1          MS. COOK:  Yes, I do want to respond, Judge.  I apologize

2     for standing for so long.

3          We have discovery on exactly these topics.  It's requests 9

4     and 10 for all the plaintiffs and requests for 5 and 6 for Salud

5     just on this bus refund issue.

6          At the hearing in August, almost two months ago when on

7     Page 52, you said on this very topic that we need to know --

8     Caterpillar needs to have some indication of the cost of operating a

9     bus because obviously, not all of the money you charge someone is

10    going to be refunded.

11         In fact, you used the same example and said if it's $120 a

12    trip and 20 passengers couldn't go on that trip, you don't owe them

13    $2,000 because you have to deduct the cost of operating that bus.

14    So we've gone through this.  We've propounded this discovery.  They

15    told us they weren't going to give it to us and now they're saying

16    they're going to give it to us.  So I'm very confused on that and

17    we've just wasted two months on that topic.

18         And on the bigger picture, Judge, I think the plaintiffs --

19    and I'm not quite sure why -- but we're losing sight of the

20    complaint here.  The plaintiffs alleged in the complaint, which is

21    still the operative pleading in Paragraph 58, because the engines

22    failed, the vehicles were rendered inoperable of their on highway

23    use of transporting passengers.

24         And according to Paragraph 58, the plaintiff suffered

25    substantial financial losses and other damages.

1         Paragraph 59, by failing to provide engines that met the

2   express warranty and failing to correct the known defects, the

3   warranties have failed of their essential purpose.

4         So in this case, the plaintiffs -- and this is one of the

5   issues that Judge Seitz wants to address next week -- the plaintiffs

6   presumably the essential purpose of this warranty was to allow the

7   plaintiffs to opt to operate their on highway business of

8   transporting passengers.

9         In order to get anything beyond the remedies se forth in

10  the express warranty, they have to prove that it failed in its

11  essential purpose.  How do we analyze whether or not that's correct

12  unless we know how these businesses were doing.

13        If Roadrunner, for example, notwithstanding instances of

14  needing to have their buses repaired or serviced, still has a

15  profitable business if they are still able to transport their

16  passengers.  And if they've been successful, whether the plaintiff

17  wants to ask for that as an item of damage, the defendants are

18  entitled to look at that issue to determine whether or not they're

19  entitled to consequential damages.

20        So what I would suggest that no matter what their lost

21  profits may have been, an engine that doesn't run and that doesn't

22  run 90 percent of the time, has failed of its essential purpose,

23  regardless of the use to which it was put.  If that turns out to be

24  the proof that may be, Judge, but when you look at what has been

25  produced that's certainly not what happened.  The plaintiff, in

1  answering the discovery, listed the number of times that these buses

2  had to be repaired.

3          THE COURT:  Okay.

4          MS. COOK:  And over a six-year period.  It's not a lot.  So

5  theses buses were working and these buses were transporting

6  passengers and the essential -- how are they going to prove that

7  if --

8          THE COURT:  And again, look at how often the buses broke

9  down when they were used and so you need the information about these

10 buses.  Do you need their gross profits over the year -- I don't

11 think so -- or their net profits because the failure of their

12 essential purpose may or may not be a small part of their business.

13 But if the bus wasn't operable and repeatedly wasn't operable,

14 you're suggesting that it would be a defense that whether it didn't

15 need the bus anyway because they had other buses that could take

16 over the passengers?

17         MS. COOK:  Well, Judge, part of my understanding is part of

18 why you ordered that they produce these logs is that, again, we

19 don't know how these businesses operate.  We weren't able to depose

20 the plaintiffs.  All of those depositions were cancelled and they

21 have been rescheduled in late November because we didn't have the

22 documents that we've requested.

23         If they've got a fleet of ex-number of buses and a bus is

24 not working, but they were able to substitute it with another bus

25 and nevertheless, do what they needed to do, that's in the big

1  picture part of our analysis to determine whether or not this

2  warranty failed of its essential purpose.

3          THE COURT:  I don't see it.  I don't see it.  I mean, if

4  you have a bus and the engine has broken down, you look at the

5  engine to see if the engine has failed of its essential purpose,

6  that if it's unable to push the bus -- or pull the bus depending on

7  whether it's in the front or the back -- but the fact that they had

8  other buses that could pick up the slack, means they didn't lose

9  profits.  And that's why you would need the lost profits.

10          If they were claiming a loss of profits as a result of the

11  fact that the bus was out of service, then you would need to know

12  the whole scope of their business because then you would need to be

13  able to analyze, well, was half their fleet idle anyway so they

14  didn't really lose any profits as a result of this particular bus

15  being out of service.

16          On the other hand, if every other bus in their fleet was

17  otherwise occupied and so they couldn't use this bus to generate

18  revenue, then there would be a loss of profit.  And that was the

19  basis for the ruling that you needed to look at the whole enterprise

20  to determine whether there truly were lost profits.

21          Now, there's other information that you would need to know

22  with respect to the bus refund issue and that's in terms of the cost

23  of operating the buses and what goes into the cost of operating the

24  buses.

25          So you certainly would be, if they are claiming on the

1  refund that they need to be reimbursed for those refunds, you would

2  certainly be entitled to documents that would show the cost of

3  operating the particular buses, but that does not necessarily mean

4  you need to know their whole business operation, soup to nuts, it

5  seems to me.

6         MS. COOK:  Okay.  And I understand, Judge, but part of, you

7  know, two of the four requests we're talking about go to the issue,

8  I believe, that you have just enunciated, which is requests 9 and 10

9  for all plaintiffs and requests 5 and 6 for Salud, which is logs and

10 maintenance information related to all of the buses.

11        In the plaintiff's answers to some of their interrogatories

12 they're claiming excessive warranty repairs and I think that was

13 part of what Mr. Leopold was just discussing in terms of the

14 diminution of value, category of documents.

15        If the rest of the buses, I guess, how do you prove

16 something is excessive unless you know what was going on with the

17 rest of the fleet.

18        THE COURT:  Well, that's different than financial documents

19 and that's what I'm talking about here, the financial documents.

20        MS. COOK:  Which are requests.  It's number one on our

21 notice.  That's what you're referring to?

22        THE COURT:  Right.

23        MS. COOK:  And I understand what you're saying, Judge, and

24 I had gone on to the second part of that which is number two.

25        THE COURT:  I mean, it seems to me, if the plaintiff is

1  limiting what it is asking for from what's in the complaint, the

2  plaintiff needs to be very clear on how it is computing the damages

3  that it is seeking.  And you need to file, you know, a notice of

4  limitation on damages sought by the plaintiff, or something like

5  that.  In that way, you will know -- they will know -- what limits

6  specifically.  In that notice you would give -- and I don't know if

7  it has to -- and it really should be part of the court record

8  because your complaint is part of the court record.  And you would

9  need to show the computation of such damages, how it's being

10  computed.  And this is all by initial disclosures anyway, as I

11  recall.

12       So how you compute each of the elements of damages and then

13  you have to produce all of the documents that are relevant, that are

14  responsive to this, which would be the documents that are relevant,

15  not just to support your claims, but for them to be able to

16  challenge.  So it's broader than Rule 26 initial disclosures the

17  discovery that's sought.

18       So it would just seem to me what they're saying is that if,

19  you know, the elimination of lost profits, I think, does narrow the

20  scope of financial documents that are required because you're no

21  longer claiming that because this bus was out of service we were not

22  able to earn a profit that this bus would have earned on various

23  trips.

24       MR. LEOPOLD:  That is correct, Your Honor.

25       And I think it's important to point out as well -- and I

1  appreciate perhaps why, respectfully, counsel referred to the

2  transcript that was not referenced to the Court.  Also, at Page 53

3  is the Court went on to say:

4          So having said that, it seems to me to some extent these

5  requests are overbroad.  And yet, I am not sure how we can narrow

6  that.  And Mr. Shub, my co-counsel in this matter, along with

7  counsel, we all need to get back together and have them meet and

8  confer and narrow down the issues.

9          Exactly what Your Honor was just referencing.  So what I

10  would suggest -- and I'm not sure if that has been done.  I was not

11  involved.

12          THE COURT:  It was.

13          MR. LEOPOLD:  So if it was done, we need to be followup on

14  that confirmation, or meet and confer.

15          And we need to narrow and advise the Court on this aspect

16  because on the diminution of value and replacement cost for the

17  engines that is a category of expert and industry type of

18  information.  But on this particular avenue of out-of-pocket

19  expenses, we need to solidify that issue and advise them and I think

20  we can do that.

21          THE COURT:  Okay.  So it seems to me, you know, that

22  basically if you're eliminating lost profits, the scope of what is

23  needed in terms of financial information is limited.

24          Now, with respect to the excessive repairs issue, she

25  claims that -- well, not just Miss Cook, but on behalf of the

1  defendants Caterpillar claims that they need to know what type of

2  repairs were done on your other buses and the logs of repairs and

3  out-of-service to show that these buses were no worse than any of

4  your other buses.

5       MR. LEOPOLD:  Well, that's respectfully a misnomer by the

6  defendant, or perhaps a fail attempt to not be -- Caterpillar not

7  being fully candid with the Court in terms of what transpires when a

8  bus is brought in for repair.

9       And I have the documents and I am happy to approach the

10 bench and show the Court just on the documents related to repairs on

11 these buses, every bus that is brought into a Caterpillar dealer is

12 downloaded with an ECM computer database, as I'm sure the Court is

13 aware, just like every automobile has its database.

14      How many times the engine starts.  The air bags fire.  What

15 speeds are brakes applied?  Are seatbelts used?  Everything is

16 downloaded.  And not only downloaded, but downloaded to corporate

17 offices at Caterpillar.  And all that information is gathered by

18 Caterpillar.  They have all of that information already in-house.

19 And in fact, in this particular case, Caterpillar has produced those

20 ECM downloads for each of the buses that our clients have brought in

21 for repair.  So they have all of that information.

22      THE COURT:  They're talking about the other buses in your

23 fleet, I guess, that aren't Caterpillar.

24      Let me put it this way.  Do you have buses that have

25 engines that are not Caterpillar engines?  I mean, I know that there

1  are other engine manufacturers out there, I think.

2          MR. LEOPOLD:  We do, Your Honor, but whatever type of

3  engines or regeneration systems, if any, that those other buses have

4  it's a completely separate model, design, specifications, testing

5  protocol, regulations.  It has nothing to do with the substantial

6  similarity, or identical axillary regeneration device system that

7  was in the Caterpillar buses -- or engines I should say -- that is

8  the subject of this litigation.

9          So basically, if I were to come in on an individual product

10 liability case and say I want the rollovers for all other vehicles,

11 even though I'm just suing Chrysler for stability and handling, but

12 I want GM SUV rollovers.  I want General Motors SUV rollovers.  I

13 want Ford SUV rollovers.  They would look at me like I was insane,

14 as I believe any court would.  That has no relevance at all to the

15 issues being litigated here.

16         And so, the repair information about other buses that have

17 no design characteristics to the litigation, to this litigation, I

18 don't see any relevance at all.  It's just generally defendant's

19 statements that it's the truth -- I have no idea why that would be

20 relevant.

21         THE COURT:  Okay.  Miss Cook.

22         MS. COOK:  Sure.  I believe you answered the question,

23 Judge, by saying that -- by asking them whether they had buses in

24 their fleet that don't have the CAT engines and that's the whole

25 point.

1           Obviously, Caterpillar has data on Caterpillar engines if,

2    in fact, they were taken in for warranty repairs, but if the

3    plaintiff has a fleet of ex-number of buses, five of which don't

4    have Caterpillar engines, we are entitled to know how often those

5    other buses were maintained so that we could find out whether or not

6    these buses, that they're complaining about, had excessive repairs.

7           If they were taken in for repairs as often, or more often

8    than the buses with CAT engines, we should be able to know that or

9    we're just asking for logs of repairs, or maintenance for buses who

10   don't have these subjects engines.

11          They're the ones, who in their answers to interrogatories,

12   Judge, brought up this issue.  And it's Interrogatory Number 13.  I

13   apologize.  I thought I had it.  Yes, it's Interrogatory Number 13.

14   The plaintiffs allege that there were excessive warranty repairs in

15   their answer on Page 15.  And this interrogatory went to the issue

16   of us being on notice for defects.

17          THE COURT:  I'm not sure I have Interrogatory 13 to --

18          MS. COOK:  Salud.

19          THE COURT:  To Salud or --

20          MS. COOK:  To everybody else.

21          THE COURT:  Okay.  It says --

22          MS. COOK:  I don't know which one you're looking at.

23          THE COURT:  It's not my interrogatory.

24          MS. COOK:  In Salud's answer -- excuse me -- Eclipse is the

25   one picked up.

1          THE COURT:  Okay.  Let me find where it is on Page 5.

2          MS. COOK:  I can hand you mine if that makes it easier.

3          THE COURT:  I'm going to see if I have it on mine.  Eclipse

4   is -- okay.

5          MS. COOK:  It's Tab b(1).

6          THE COURT:  B(1) which is what I was actually looking at.

7          MS. COOK:  There's interrogatories and requests for --

8          THE COURT:  Right.  I've got 11, 12; and you're saying it's

9   12 or 13?

10         MS. COOK:  13; it's on Page 5.

11         THE COURT:  Let's look at Page 5.

12         MS. COOK:  Page 5 is their answer.  It says that it's

13  pursuant to the direction of the Court.

14         THE COURT:  Okay.  So you're saying that since they're

15  claiming that these buses were excessively broken down excessively

16  you're entitled to know how often their other buses broke down?

17         MS. COOK:  Or were repaired.

18         THE COURT:  Or were repaired.

19         MS. COOK:  Yes.

20         THE COURT:  So for similar problems wouldn't it -- if

21  you're, for example, if you're suing over a defective engine, the

22  fact that other buses had defective tires wouldn't be relevant,

23  would it?

24         MS. COOK:  Judge, their claim is that their engines because

25  they had to be repaired so often rendered the buses inoperable.

1  That was the point.  They couldn't run these buses.  They couldn't

2  operate their business.

3         And so if other buses were repaired excessively or

4  repaired, I think we're entitled -- it may ultimately, I guess,

5  there's going to be issues of admissibility.  And we don't know what

6  they have and perhaps if we just had maintenance logs of other buses

7  that would be a good starting point because there certainly may be

8  things that aren't really, you know, things that we're entitled to.

9  But I think a log showing the maintenance on the other buses would

10  certainly be discoverable.

11         THE COURT:  So in part that may go to how these particular

12  companies operate their bus fleet.  There may be companies that

13  operate, you know, that aren't perhaps changing the oil or doing

14  whatever it is they need to do, or they're overheating them or

15  running them for too long.  I don't know what goes into --

16         MS. COOK:  And Judge, I believe this is within the scope

17  that was requested initially that you order that they produce back

18  in August; numbers 9 and 10.

19         THE COURT:  I'm looking at it.  I'm sure it was, but that

20  was all tied into --

21         MR. LEOPOLD:  Lost profits, Your Honor.

22         THE COURT:  Yeah, that was all tied into lost profits.

23         MS. COOK:  Partially, Judge, but if part --

24         THE COURT:  I didn't reach anything.  Let me put it this

25  way.  That was the basis of my ruling.

1       MS. COOK:  Absolutely.

2       THE COURT:  That it was related to lost profits and I

3  didn't need to go beyond that because it was related to lost

4  profits.

5       MS. COOK:  Correct.  But you did analyze the issue, for

6  example, of refunds.  And you did talk about the idea that you can't

7  get a hundred --

8       THE COURT:  I understand.  That's a whole different issue

9  than what we're at right now.  It seems to me they ought to be able

10  to get the maintenance logs of other buses that your client has.  I

11  haven't seen any showing of burdensomeness.  You're arguing it's not

12  relevant.

13      If your client has a history of neglecting its engines,

14  such that all of its engines are breaking down all of the time, then

15  it seems to me that they should be entitled to explore that.

16      MR. LEOPOLD:  What I believe that Caterpillar is attempting

17  to do, is to bootstrap some of these arguments.

18      If, for example -- and I would agree with the Court -- our

19  clients have other buses with the identical same emission system,

20  the ACERT emission system, I would agree they are entitled to that.

21      If we have buses that have no emission systems that are

22  even substantially similar to the emission system which is the

23  subject of this litigation, then I don't see any relevance to it at

24  all.

25      Number two, the only relevance for this litigation is how

1  well they were maintaining the buses that are at issue in this case.

2  And every time these buses needed repairs, oil changes, servicing,

3  whatever it may be, they go to a Caterpillar facility and

4  Caterpillar documents through the ECM, exactly to a fare-thee-well,

5  of what is being done and it goes to corporate and they have that

6  information.  And in fact, they've produced that information to us.

7  So I guess --

8         THE COURT:  What are you talking about here in terms of the

9  volume?

10         MR. LEOPOLD:  I have no idea, Your Honor.

11         I don't think there are any, quote, maintenance journals.

12  I've never seen a maintenance journal.  I've seen repair and

13  maintenance documents where somebody goes -- and just as we go as

14  individuals -- you go to the car dealer and they give you a document

15  and you file it away.  I'm not aware of anybody keeping a journal of

16  maintenance.

17         But again, I think in good faith we will go back and for

18  any buses that are not a part of this litigation, but have the

19  identical same emission system, we will produce those repair

20  records.

21         THE COURT:  Well, how would any bus -- I mean, wouldn't

22  that be line a patent violation or something if they had an

23  identical emission system?

24         MR. LEOPOLD:  No.  This particular axillary regeneration

25  system could be in other buses.

```
 1          In other words, Caterpillar manufacturers this particular
 2   device and they may have put it into other types of buses that our
 3   clients have.  So we will make that good faith effort and provide
 4   those maintenance records for that, but I don't believe that there
 5   are going to be anything.
 6          So we will make that good factures this particular device
 7   and they may have put it into other types of buses that our clients
 8   have.  So we will make that good faith effort to provide those
 9   maintenance records for that, but I don't believe that there are
10   going to be anything that is going to amount to the same emissions
11   system that is the subject of this litigation.  All the emission
12   systems that we have failed.  That is why there was a warranty
13   recall and that is why these buses have gone to be repaired.
14          MS. COOK:  Your Honor, he's talking about really
15   admissibility.  We are now at the discovery stage.  We are --
16   whether it's this exact -- if it's this exact engine it's going to
17   be these buses.
18          I think there may be other -- there are certainly other
19   technologies out there.  That's part of their argument is that
20   Caterpillar chose one technology to comply with the EPA and other
21   companies used a different technology.
22          THE COURT:  I haven't heard a burdensome ness argument.  I
23   don't know how many buses we're talking about.  I don't know.
24   There's no issue regarding the difficulty in producing information.
25          I don't know how many other buses, other types of buses
```

1  there are in a fleet.  It would seem to me that if you're saying

2  there was excessive warranty repairs on these buses in our fleet,

3  they're entitled to explore whether other buses were equally

4  breaking down to see whether the warranty repairs here were

5  excessive or not.

6           And so you need to produce -- and I'll just say --

7  sufficient documents to show the warranty repairs on the non

8  Caterpillar buses in the fleet because Caterpillar has the records

9  of its own buses.  And so they, I assume, can equally search for

10  those records in your own records.

11           MS. COOK:  Yes, Judge.  Again, they're Caterpillar.  We

12  don't make the bus.

13           THE COURT:  You don't make the engines.

14           MS. COOK:  We don't make the engines.

15           THE COURT:  I understand that.  And when I say Caterpillar

16  buses, I mean --

17           MS. COOK:  Shorthand.  I get it.

18           THE COURT:  Exactly.  It's a shorthand --

19           MS. COOK:  -- terminology.

20           THE COURT:  Yes, thank you.  I'm not tagging you with

21  the --

22           MS. COOK:  No, we understand, Judge.

23           THE COURT:  With the cav -- but I think the plaintiffs need

24  to produce that.  And then, you can argue over whether they're

25  admissible, if they're not admissible, whether the engines are

1 sufficiently similar, or not similar.

2         I mean there's a whole host of things that could go into a

3 determination of whether something is an excessive warranty repair.

4 I mean, perhaps the Caterpillar engines needed to be repaired the

5 same amount of time as other engines, but because of the way the

6 Caterpillar system worked, it precluded -- it prevented repairs for

7 one type of defect, but the other buses that didn't have the

8 emissions -- I know I'm getting convoluted.  It just seems to me

9 that you can compare the buses.  And then, you can see whether or

10 not there was excessive warranty repair or not and they'll have

11 their argument on that.

12         Okay.  And just to go back because we are at, you know, we

13 are over an hour into our 20-minute hearing.  It seems to me that

14 with respect to, in general, the claims, the discovery issues that

15 relate to the damages, the financial documents.

16         What I have ruled is that the plaintiff needs to provide

17 its current damage estimate and methods of computation for each

18 category of damage presently claimed.

19         MR. LEOPOLD:  Your Honor, may I just raise one issue?

20         THE COURT:  Yes.

21         MR. LEOPOLD:  That we will, of course, endeavor to follow

22 the Court's order, but on some of the elements of the damages, as I

23 alluded to, on the diminution of value and the replacement cost of

24 the engines, without expert testimony and discovery that may be

25 difficult to do.  We can outline what the elements generally are,

1  but at this point, we may not be able to be specific and give the

2  actual damages, per se.

3        THE COURT:  All right.  You need the methodology that's

4  going to be used and it needs to be described with specific

5  particularity so that the parties can determine what financial

6  documents would be needed to go into that.  And that applies to both

7  the out-of-pocket expenses as well as the diminution of value,

8  replacement of engine calculations.

9        And to the extent that you can't make a final damage

10  calculation, what I'm ordering here is that you need to provide a

11  sufficient detailed methodology so that the defendants can challenge

12  whatever and how you come up eventually without having to have a

13  discovery issue at the end where your expert has relied upon a whole

14  variety of your client's cost and they didn't get that financial

15  information because you said it wasn't relevant.

16        MR. LEOPOLD:  And just as on that issue of the 45 days, if

17  we could -- because I don't think there's any great rush for that

18  particular issue.

19        MS. COOK:  Judge, the problem is we've got a deadline, a

20  cutoff in January for class --

21        THE COURT:  Class certification.

22        MS. COOK:  For discovery.

23        We've got deadlines coming up in terms of experts.  The

24  deadline for depositions of the plaintiff's experts is going to be

25  November 15th.  We won't even have the information by then.  We

1  rescheduled the plaintiff's depositions to begin the first week of

2  November.  We're not going to have this information by then.

3          If, you know, we would ask that they give it to us by

4  October 31st.  I mean, these same issues were forensic long ago when

5  we explained why we wanted -- even considering the lost profit

6  issue, even if they're not claiming lost profits, this information

7  about other buses and things should have been part of what they

8  produced.  They knew what their damages were going to be.

9          So we're just going to really run into issues with the

10 deadlines that Judge Seitz has put into place.

11         MS. COOK:  Okay.  Judge Seitz' deadlines that you've just

12 discussed relate to the class certification deadlines, correct, and

13 not the ultimate --

14         THE COURT:  Correct.  But a lot of these issues relate to

15 commonality and typicality and things that we need to have our

16 experts comment on those issues.  And a lot of that is going to come

17 out of what they're going to be producing and we don't yet have --

18         MR. LEOPOLD:  Your Honor, I'm not saying that it's not

19 relevant and not necessary.  I'm just saying that we have truly

20 refined the issues this morning and we're asking for 45 days and I

21 don't think that's unreasonable.

22         THE COURT:  Well, I think you ought to be able to provide

23 your methodology within a week.  I mean, your methodology is going

24 to be your methodology, it would assume to me.  And you certainly

25 ought to be aware, at this point, what your methodology is in terms

1  of how you've refined it.

2      So I would say that you need to file your notice of

3  limitation on damages or else provide -- and again, I've just said,

4  you know, file a notice of limitation and the methodology of

5  calculating each category of damage because that's what we're really

6  looking for here.

7      And I think you ought to be able to come up with that by

8  the 18th, you know, by October the 18th.  And then, it would seem to

9  me that you ought to be able to produce, you know, your supplemental

10  documents in light of our discussion here by the 31st.

11      I mean, this is something that has been going round and

12  roundabout and that was why I had my order that was entered, you

13  know, six weeks ago.  And that's why I wanted to recap what I had

14  done here and you just have to do it.  You just have to produce

15  those relevant documents.

16      You can produce your methodology and meet and confer, but

17  you know what documents you're going to be using for this, it seems

18  to me.  And you ought to be able to meet and confer and you can meet

19  and confer before then.  And you can produce your methodology before

20  then if you want to have a better idea of what you're going to have

21  to produce.

22      With respect to the other documents regarding the engine

23  logs and so fourth, when did you need those by, Miss Cook?

24      MS. COOK:  Judge, I would like them by October 31st as well

25  so that we have them before the plaintiff's depositions begin.

1          MR. LEOPOLD:  We can do that, Your Honor.

2          Just so the record is clear, if you say maintenance logs,

3   I'm not sure there are logs but --

4          MS. COOK:  No, but --

5          MR. LEOPOLD:  If there are records we will provide them.

6          THE COURT:  Right.  Records.

7          And again, when I say that -- and sometimes I use a

8   shorthand term -- but I want records that are sufficient to show the

9   repair work on the non Caterpillar engines.

10         MR. LEOPOLD:  And Your Honor, can I clarify?

11         And perhaps defense counsel and I can speak about this, but

12  what time frame are we talking about?

13         MS. COOK:  In terms of how far back?

14         MR. LEOPOLD:  You want maintenance records for other buses

15  that, in theory, may not have any relevance to the emissions systems

16  that are involved in this litigation.  So I think we need to be

17  somewhat narrow.

18         MS. COOK:  We had asked for a year before the first bus was

19  put into service; the first Caterpillar bus was put into service.  I

20  think we had actually asked for actually two years.

21         MR. LEOPOLD:  So if you could, just for the record, give me

22  a time frame.

23         THE COURT:  Well, 2008, I believe, was when the first

24  Caterpillar, the first buses with Caterpillar engines were put into

25  service in 2007.

```
1          MR. LEOPOLD:  When the first C-13 --

2          MS. COOK:  Correct.

3          MR. LEOPOLD:  -- went into service existence for two years?

4          MS. COOK:  A year before.  One year prior to that.

5          THE COURT:  So you want the records for one year.  So give

6   me a date.

7          MS. COOK:  2007.

8          THE COURT:  Okay.  For 2007 to present.  So you're looking

9   at six years, roughly?

10         MS. COOK:  According to the --

11         THE COURT:  Seven years.

12         MS. COOK:  According to -- I mean, we know that the

13  earliest warranty repairs were in 2008.

14         MR. LEOPOLD:  And we will endeavor to do that.

15         THE COURT:  Okay.

16         MR. LEOPOLD:  Whatever is in existence.  These are small

17  companies and they may not have kept going back that far, but

18  whatever it is, it is and we will produce and advise which, you

19  know, if the records are --

20         THE COURT:  You can identify the engine and the

21  manufacturer.  And if they feel it's sufficiently important for them

22  to pursue it, I guess you can subpoena that manufacturer to get the

23  detailed records once you know the particular engine.

24         MS. COOK:  Okay.

25         MR. LEOPOLD:  Thank you, Your Honor.
```

1          MS. COOK:  And Judge, as part of the documents for the

2    other buses, we had also requested and still believe that it's

3    appropriate the trip logs for the other buses as well because that

4    shows how they were used and when they were used.  And on this

5    refund issue, whether other buses would have been in service on the

6    dates of the repairs that they're claiming were --

7          THE COURT:  What difference does it make if the other buses

8    were in service or not if they're not claiming lost profits?

9    They're not claiming that other buses weren't available.

10          MS. COOK:  Because if there was a particular bus broken

11   down on a particular day that had this engine in it and they're

12   claiming refunds for that bus, as an example, and yet we know that

13   other buses were in service that day, that goes to part of the

14   calculation as to whether or not they actually incurred, you know,

15   whether they had another bus running, then perhaps that entire

16   amount is refundable.

17          THE COURT:  I totally lost you.

18          MS. COOK:  It's part of the analysis of whether or not of

19   the plaintiff's damages on their individual claims that they had to

20   refund passengers on the issue of excessive warranties on the issue

21   of failure of the essential purpose of the warranty.

22          If they have other buses that are running and operational

23   on the dates that our buses were not running, then they were able to

24   fulfill their purpose of having the --

25          THE COURT:  The purpose of the --

1          MS. COOK:  -- on the highway transportation business.

2          THE COURT:  The failure of essential purpose goes to your

3   engine.  Whether or not they had 8,000 other engines that were

4   appropriately running, if your engine never ever worked, there would

5   be a failure of its essential purpose.

6          So the fact that they were able to overcome your allegedly

7   defective -- and I'm not saying that it was because I don't know --

8   the fact that they had other buses running, to me, does not go to

9   whether your engine failed of its essential purpose.

10          MS. COOK:  Judge, they're -- and I understand.

11          THE COURT:  And they've abandoned their lost profit claim.

12          MS. COOK:  Their lawsuit claims that because -- again,

13   Paragraph 58, because the engines failed the vehicles were rendered

14   inoperable of their on highway use of transporting passengers.  And

15   therefore, the plaintiff suffered financial losses and other damage

16   because they were not able to operate their business.

17          THE COURT:  And they have now abandoned the lost profits

18   claim that that goes to.  And I have required them to put in a

19   document what they are limiting their damage to.

20          I would agree with you one hundred percent if they were

21   claiming lost profits, but they're not.  So the only issue that

22   arguably goes to a lost profits analysis is the passenger refund.

23   And the documents re, passenger refund, that need to be produced are

24   the documents that would show the amount of the refund and the

25   portion of that, which is attributable to a cost not incurred due to

1   the trip cancellation.

2          So it would seem to me that the amount of the refund that

3   they are seeking is the amount that would be a lost profit on that

4   ticket and those documents you're still entitled to.  Anything that

5   would go to, for example, the pay to the driver.  So normally, you

6   would have had to pay a driver ten cents a passenger, or whatever it

7   was for that particular trip.  So you would be entitled to all the

8   financial aspects of that trip.

9          So any documents you know, that show the financial aspects

10  of a particular trip would have to be, you know, would have to be

11  provided, but not the overall financial aspect of the operation of

12  the company in great detail.

13         And I don't know how we got off on this tangent because I

14  was going back to the -- I thought I was going back to the

15  maintenance logs of other buses or the --

16         MS. COOK:  Judge, I think it was my fault.  I brought up

17  another category of documents and put you on that tangent.  So I

18  apologize because you were talking about maintenance logs on other

19  buses on the excessive warranty claim.

20         THE COURT:  Right.  And so those records need to be

21  produced from 2007 to the present.  You can pursue them.  Those are

22  the engine records.

23         Now, going on the refund issue, those are the documents

24  that need to be produced.  The documents that would show the

25  financial aspects of a particular trip.  And that would be part of

53

your, you know, your damage computation which sort of goes back to

the beginning, but what I'm not requiring are overall -- the overall

health of the company type documents that might be relevant else

wise.

And so, you know, part of this -- and those, again, are

needed to be produced by October 31st.  That's the general deadline.

If there's some issue you produce, you can and talk to the other

side about getting an extension.  And then, if not, you can come

back before me.

But I will say that if something comes up and you can't

comply with my order, it's really your job to bring it before me on

a discovery hearing saying, well, we know that you ordered us to do

this.  We want you to amend your order not to require it because we

are abandoning our position or we are narrowing our claim.

As opposed to providing a supplement six weeks later that

just says, well, we've decided not to do this so we don't have to

comply with the Court's order.  I mean, I don't want to -- because

now we have this dispute that now it's delayed until the last -- not

the last minute because we do have time, but it's certainly delayed

beyond what we could have resolved, you know, when you made that

decision.

Of course, you may not have made the decision until you

were preparing your supplemental responses and realized what was

involved and weighed.  I assume there was some weighing of the cost

benefit analysis of a lost profit versus the time that would be

1  consumed in the privacy interest and overall financial interest.

2       So now, I'll let you go, Miss Cook.  What do you want next?

3       MS. COOK:  Well, I know we've been here a long time, Judge,

4  and I'll try to summarize the rest of it.

5       The remaining requests in numbers 3, 4, and 5, and they are

6  Interrogatory 12 for all plaintiffs, except Salud; Interrogatory 8

7  for Salud; Interrogatory 13 for all plaintiffs; Interrogatory Number

8  9 for Salud, requests 28, 30, 31 and 35 for all plaintiffs; requests

9  14, 16, and 35 -- I'm sorry -- 14 and 16 for Salud.

10      What the plaintiffs have done in --

11      THE COURT:  And 18?

12      MS. COOK:  And 18.

13      What the plaintiffs have done in responding, Judge, is

14  given very broad categories of concepts really.  They're not facts

15  or documents to answer the discovery request.

16      And we would just ask -- what we've tried to do when we

17  respond to a document request is we give them a Bate span.  We let

18  them know what documents we're producing that are responsive to that

19  particular request.  And we would ask that the plaintiffs do that as

20  well.

21      They have produced a lot of stuff that is not associated

22  with any particular discovery response.  So in general, we would ask

23  that you order them to do that.

24      THE COURT:  Okay.  I will order that.  I mean, if you

25  produced it -- I did see there were a variety of documents produced

1  by Gentry mainly.

2          MS. COOK:  Correct.

3          THE COURT:  And you need to identify what that responds to

4  instead of just --

5          MR. LEOPOLD:  I'll do that.

6          THE COURT:  Okay.

7          MR. LEOPOLD:  And also, just so I --

8          THE COURT:  And that will be by October 31st.

9          MR. LEOPOLD:  And just so I know for the 28,000 documents

10 that are being produced today and I'm trusting that that has been

11 done for us.

12         MS. COOK:  Yes.  There is a cover letter and everything is

13 addressed with Bate span.  We have done that.

14         MR. LEOPOLD:  Which documents were responsive to the

15 request?

16         MS. COOK:  Correct.

17         MR. LEOPOLD:  Thank you.  Great.

18         THE COURT:  Okay.  So that's a fairly easy one.

19         With respect to this specificity, I couldn't tell whether

20 it's specific or not because I don't know what familiarity you have

21 with the charts; the information contained in the charts.  It looks

22 pretty specific.  You gave the engine number and detail.

23         MS. COOK:  Well, Salud, as an example, Judge, is --

24         THE COURT:  And I will admit, I did not go through six sets

25 of different answers.

1        MS. COOK:  Oh, I understand.

2        THE COURT:  So you need to point out to me.

3        MS. COOK:  In Salud's answer to Interrogatory Number 8,

4   it's on Page 6.

5        THE COURT:  Right.

6        MS. COOK:  They've given us a chart of some type and I

7   don't really know what this is and I don't know that it provides the

8   information we're seeking.

9        I think these are names of the bus drivers, but I would ask

10  that this be supplemented in a way that complies with your order.

11  To the extent that the other plaintiffs provided a summary of the

12  repairs that their buses had, I think that we can figure out from

13  that information, but for Salud we really -- I would ask that you

14  order that they give us a better response.

15       THE COURT:  Okay.  I will tell you, it seems to me, Salud's

16  response doesn't -- I mean, it doesn't even give a day.

17       MS. COOK:  Yeah, I don't know what that is.

18       MR. LEOPOLD:  We can supplement it, Your Honor.

19       THE COURT:  Okay.  So you need to supplement --

20       MR. LEOPOLD:  We'll provide the identifying categories for

21  counsel.

22       MS. COOK:  There were also questions to request 39 for all

23  of the plaintiffs.  I don't think there was an analogous one to

24  Salud.  These were documents regarding refunds.

25       An issue we've spoken about today, sensibly, but the

1  plaintiff we think -- they gave us several spreadsheets from Gentry

2  that we think are responsive to this request, but we would ask that

3  they let us know that, number one.  And a meet and confer about

4  these issues, they told us that none of the other plaintiffs have

5  any of these damages, or at least they don't have any documents in

6  their possession right now that indicate any refunds were given and

7  that they were going to supplement their responses and that still

8  hasn't happened and we would like you to order that they do that.

9       THE COURT:  Okay.  So you need to supplement for request

10 for production number 39 for all of the plaintiffs to reflect either

11 no refunds or identify them.

12      MR. LEOPOLD:  We'll do that.

13      THE COURT:  Or I suppose, produce the documents, it would

14 be.  Okay.  And again, by October 31st; okay.

15      MS. COOK:  And Judge, as far as requests to produce numbers

16 28, 30, and 35, they've responded by giving categories of documents.

17 We don't know whether any of the documents they've produced are

18 responsive because they haven't given us the Bate spans.

19      THE COURT:  Well, they're going to give you a Bate span by

20 October 31st.  And if there's a problem after that, then you can

21 come back.

22      MS. COOK:  Okay.

23      THE COURT:  And you know, the first week of November, you

24 know, after you get it or, you know, I think that's a good week.

25      MS. COOK:  I think that would.  Then, I think we should be

1 okay and if we have an issue we'll bring it up then.  Thank you very

2 much for your time.

3          THE COURT:  Okay.  So for all of your discovery responses,

4 if you've produced documents, you need to give the Bate number and

5 the response that correlates.

6          MR. LEOPOLD:  Number 28, it's my understanding, basically,

7 the documents we provided were Caterpillar's own documents, but

8 we'll set forth in there the Bates numbers that Caterpillar gave us

9 of their own documents.  I understand that they need --

10          THE COURT:  Well, that's fine.

11          They want to know what you contend shows because

12 Caterpillar is giving you now more than 28,000 documents and so

13 which of those are you contending --

14          MR. LEOPOLD:  Right.

15          THE COURT:  And if it's all of them, then you list all of

16 Caterpillar's documents.

17          MR. LEOPOLD:  Your Honor, I know time is short and I

18 greatly appreciate the Court's time this morning and I'm sure I

19 speak on behalf of all parties when I say that.

20          One of the issues, the Court asked us to have a meet and

21 confer and we have forensic it already.  And when I walk out of

22 here, I will discuss it again, but the search methodology and the

23 search terms used that is going to be an issue.  I think it's going

24 to come up before Judge Seitz next week.

25          If we cannot agree on that particular issue, we need to

1 have some expedited ruling on that issue.  I mean, the Court has

2 already indicated that they need to provide the methodology and

3 search terms.  I don't know if they objected to doing that.

4      MS. COOK:  We had planned to do that, Judge, along with our

5 production to give you when we answered that particular request to

6 provide the search term.

7      MR. LEOPOLD:  Well, they are now going into this universe

8 of documents that had been retained from another litigation that we

9 believe is --

10      THE COURT:  You're searching now, right?  You've searching

11 this third wave of documents now.  So you know the methodology that

12 you're using, or somebody knows the methodology that is being used.

13 If you don't know, Miss Cook, Mr. De Piano -- you know, I keep going

14 to say Piano and I know that's not right.

15      MR. DE PIANO:  De Piano.  It depends if I'm in New Jersey

16 or Florida, really.

17      THE COURT:  Okay.

18      MR. DE PIANO:  Your Honor, actually, we're refining that

19 now.  It's a per request methodology and there are 70 of them, but

20 that's the stage that we're in.  And as, I think, Miss Cook

21 indicated that we intend to provide with each request, in the

22 narrative, the search terms that were used to invite -- I mean,

23 confer should there be any issue.

24      MR. LEOPOLD:  Respectfully, I'm not sure what per search

25 methodology.  There's generally one methodology and a variety of

1   search terms that are used to search a core group of documents.

2          Now that they've agreed to give us that information, we

3   would ask by the end of this week that they provide us in letter

4   form or pleading -- I'm not sure if it's confidential or not -- but

5   a pleading of some form that we know what that is because we may

6   need to raise that issue with this Court or with Judge Seitz at the

7   hearing.

8          MR. DE PIANO:  Well, I think I explained the general

9   methodology on the record here today, Your Honor, that we are

10  creating search terms --

11         THE COURT:  Where are you on this?  I would think that you

12  would be pretty far along in the process of your methodology and

13  then it's a question of going through the documents.

14         I don't know how you're doing it, but it would seem to me

15  that you would be able to meet and confer in terms of the

16  methodology being used.  Because the last thing that you want to

17  have happen is you omit a search term that they believe is

18  absolutely critical.

19         And then, you have to redo it because you omitted it

20  because you didn't talk about your search terms because it's done in

21  every single case that I have before you conducted the search, you

22  know, I'm going to say, okay, you have two days to redo your search

23  and I don't think you want that.  I don't think they want it or I

24  want it.  I mean, that's --

25         MR. LEOPOLD:  Respectfully, Judge, that's a good point that

1  we should discuss it.  That has not been brought up.  There was a

2  letter written asking about how we created this master universe that

3  wasn't tied to any particular litigation.

4      THE COURT:  No, I understand that.  They're not saying that

5  you turn it over also.  What I want the parties to do, is I want you

6  to get down and I want you to get together -- I didn't mean get down

7  -- get together.

8      MS. COOK:  Couldn't we do that too?

9      THE COURT:  I'm not going there.  That won't be part of the

10 order.

11     I want the parties to -- I want you to meet and confer

12 regarding the search terms and methodology, you know, for searching

13 the last wave -- however, we want to call it -- the last wave.

14     And I know I'm on criminal duty next week.  So I'm really

15 not going to be available.  I hear there's like a huge series of

16 arrests that are starting today like 50 or 60 people.

17     And what that means is all the bond hearings will be before

18 me next week, or the detention hearings, and I don't know all the

19 details.  So it could be a very busy duty week next week for me.

20 For some reason my duty week has got jammed up altogether.  I'm

21 having them every three weeks instead of every two months.

22     MR. LEOPOLD:  Your Honor, the issue -- and I appreciate the

23 Court's involvement in this.  This meet and confer has occurred one

24 time where the defendants refuse to --

25     THE COURT:  Well, we don't need to go through that again.

1   You've already said that and it happened back in April.  You didn't

2   -- that wasn't specifically put on your notice.

3        So what I'm saying is, I want you to have -- I am ordering

4   a discussion about the search terms.  Whatever happened in the past,

5   I feel fairly confident, at least with these folks -- not with

6   everybody who comes in front of me -- but at least with these

7   defense counsel, as well as plaintiff's counsel that when I enter an

8   order you'll do it.

9        And if I say I want you to confer and disclose the search

10  terms and the search methodology, I don't think that they're going

11  to say, no, we won't.  They may say we're appealing that order to

12  Judge Seitz, but that seems unlikely since you intend to disclose it

13  anyway at some point.

14       So the question becomes when do you have to meet and confer

15  and disclose this.  And for that I just don't recall when Judge

16  Seitz' hearing is for next week.

17       MS. COOK:  It's the 16th.

18       THE COURT:  That's Wednesday, right?

19       MR. LEOPOLD:  Today is the 10th.

20       THE COURT:  Okay.  So you need to meet and confer by the

21  15th.

22       MR. LEOPOLD:  And that's only with regard to the responses

23  to the third request?

24       THE COURT:  To the third wave of discovery what search

25  terms you intend to use and the methodology by which you intend to

1 search this document, the preserved documents.

2         MR. LEOPOLD:  That were gathered as a result of this

3 litigation.

4         THE COURT:  Right.  That's what we've been talking about.

5         MR. LEOPOLD:  Okay.

6         THE COURT:  The search terms and methodology.  And I'll

7 just say as a result of the Texas litigation.

8         MR. LEOPOLD:  Just for clarification, Judge, it wasn't

9 created with any ties to another litigation.

10         THE COURT:  Okay.

11         MR. LEOPOLD:  It was a snapshot of it was vastly overly

12 inclusive to any single litigation.

13         THE COURT:  Okay.  Well, it's preserved.  When I said it

14 was preserved a result of that, I didn't mean that they were

15 necessarily tied, but because of the Texas litigation you created

16 this snapshot, I would presume, or it was preserved.

17         MR. LEOPOLD:  It was preserved.

18         THE COURT:  Okay.  Right.  So it was preserved as a result

19 of the Texas litigation.  If there had been no litigation it

20 wouldn't have been preserved, right?

21         MR. LEOPOLD:  That was long before there was litigation.

22 And I just knew years ago it was preserved and it was preserved for

23 the purposes of having discovery available for lawsuits like this.

24         THE COURT:  Okay.

25         MR. LEOPOLD:  And others.

1           THE COURT:  Discovery available, okay, for lawsuits.

2           So whatever we want to call this document database and the

3  way in which it was preserved and what it contains, my guess is

4  going to be the subject of depositions, or that would be my guess.

5  They'll ask about that and you can, but whatever that's for this

6  last wave that we've just described by October 15th, I want you to

7  have met and conferred on the search terms and the methodology

8  that's being used.

9           And if there is a dispute about that, you can set it down

10 for a discovery conference in front of me.  If Judge Seitz -- I

11 mean, she may want to handle it herself.  It's highly unlikely.  And

12 that would be the week after next, the week of November 21st, but

13 you can call and get a date as soon as you realize there's a

14 dispute.  And then, you can tell Judge Seitz we had this dispute but

15 it's, you know, it's set down before the magistrate judge.

16          Now, I will tell you as I just mentioned before, October

17 31st production date is a firm production date.  So you might want

18 to be accommodating on those search terms.

19          MS. COOK:  We understand, Your Honor.

20          THE COURT:  Because if you come in front of me on October

21 31st, I will say here are the search terms and you've got ten days.

22 So however, it is you need to do your search to make sure that it is

23 done by October 31st and if there's a dispute you need to do that.

24          MS. COOK:  Okay.

25          THE COURT:  Okay.  Is there anything else that I need to do

1   today?

2          MR. LEOPOLD:  Not from the plaintiff, Your Honor.

3          THE COURT:  Anything further, Miss Cook?

4          MS. COOK:  No, we're fine.  Thank you.

5          THE COURT:  Thank you.  And I appreciate the efforts

6   counsel have made to work together and also the professionalism that

7   you show in the hearings.

8          So thank you.

9          MR. LEOPOLD:  Thank you.

10         MS. COOK:  Thank you.

11         (Thereupon, the audio recorded proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


        I hereby certify that the foregoing is an accurate

transcript of the audio recorded proceedings in the above-entitled

matter.




10/11/13                        Bonnie Joy Lewis,
                       Registered Professional Reporter
                          CASE LAW REPORTING, INC.
                          7001 Southwest 13 Street,
                        Pembroke Pines, Florida 33023
                             954-985-8875